UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x
In re:

TEXACO INC., TEXACO CAPITAL INC., and TEXACO
CAPITAL, N.V.,

                                                Reorganized Debtors.
----------------------------------------------------------------------------x
KLING REALTY COMPANY, INC., WALET PLANTING
COMPANY, et al.,

                                                OPINION AND ORDER

                          Appellants,

                                                No. 10-CV-8151 (CS)

            - against -

TEXACO, INC.,

                          Appellee.
----------------------------------------------------------------------------x

Appearances:
Peter Van N. Lockwood
Leslie M. Kelleher
Caplin & Drysdale, Chartered
Washington, D.C.
William E. Steffes
Steffes, Vingiello & McKenzie, LLC
Baton Rouge, LA
J. Michael Veron
Alonzo P. Wilson
Veron, Bice, Palermo & Wilson, LLC
Lake Charles, LA
*Counsel for Appellants*

Martin J. Bienenstock
Henry J. Ricardo
Philip Abelson
Dewey & LeBoeuf LLP
New York, New York
*Counsel for Texaco Inc., Reorganized Debtor*

-1-

Seibel, J.

Before the Court is the appeal of Appellants Kling Realty Company, Inc., Walet Planting Company, *et al.* (collectively, "Kling"), (Doc. 1), filed on December 30, 2010, from an Order of the United States Bankruptcy Court for the Southern District of New York, dated August 3, 2010 (the "Order"), (Doc. 3874[1]).  For the following reasons, the Order of the Bankruptcy Court is affirmed.

I.      **Background**

   A.      **The 1946 Lease and Subsequent Releases**

In 1946, the parties[2] entered into an oil and gas lease (the "Lease") that allowed Appellee Texaco Inc. to explore for and produce oil and gas on property in Iberia Parish, Louisiana in exchange for royalty payments to Kling.  (*See* Declaration of Henry J. Ricardo, Doc. 15 ("Ricardo Decl."), Ex. 2.)  The Lease allowed Texaco to release portions of the leased property:

> Lessee may at any time, and from time to time during the lease, execute and deliver to Lessor or place of record a release covering all or any portion or portions of the leased premises as to all or any specified mineral or minerals, and thereupon shall be relieved of all obligations as to the acreage surrendered, or as to that acreage as to only the particular mineral or minerals specified, as the case may be.  After a release of this lease in its entirety as to only part of the acreage, the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by such release.

(*Id.* ¶ 8.)  The Lease also obligated Texaco to pay for any damage it caused to the land:

---

[1]     References to documents 3837 and above refer to the Bankruptcy Court docket.  These documents are listed on the Designation of Record.  (Doc. 2.)  The docket numbers of the jointly administered chapter 11 case were 87-B-20142 to 44.

[2]     Any reference to the parties includes the parties' predecessors and successors in interest.

> [T]he Lessee shall, without undue delay, pay and reimburse to the Lessor any and all damages, in full, to Lessor's lands, crops, roads, and property, caused by its operations, either of drilling wells or laying pipelines, or in maintaining, operating, and also in constructing or using buildings, roads, and other works on the said land as permitted herein.

(*Id.* ¶ 10.)  Over the years, Texaco released certain parts of sections (referred to as numbered "Sections") of the land covered by the Lease.  For instance, in 1974, Texaco released parts of Section 21.  (Ricardo Decl. Ex. 5.)

At issue in this case is a release Texaco executed on June 6, 1986 (the "1986 Partial Release").  (Ricardo Decl. Ex. 9.)  Texaco released "any and all rights whatsoever" to almost all of the land under the Lease.  (*Id.* at Bates No. B2003900 0001024.)  The 1986 Partial Release, granted on request of Kling, (*see* Ricardo Decl. Exs. 7–8), excluded only 30 acres surrounding Well 14, located on Section 26 and the only productive well remaining under the Lease, and also reserved surface rights across neighboring Section 27 so that Texaco could access Well 14:

> Lessee further reserves and retains such rights-of-way, easements, servitudes and privileges for the operations of pipelines and other facilities located over, upon and across that portion of the leased premises hereby released [*i.e.* Section 27], which are necessary or convenient to Lessee's continued operations on the lands retained under the [Lease].

(1986 Partial Release Bates No. B2003900 0001025; *see also* Letter From Roger J. Keller, Land Manager, to Minos R. Armentor (May 14, 1986), Ricardo Decl. Ex. 8 ("In issuing this release . . . Texaco will retain the use of the surface of the released acreage which is necessary or convenient for continued operations.").)[3]  After production at Well 14 ended in July, 1987, (Stipulation ¶ 14),

---

[3] Texaco also executed a 1984 partial release of a certain portion of land in Section 27 (the "1984 Release"). This release contained the same reservation of surface rights.  (Stipulation of Facts for Hearing on Contempt Motion ("Stipulation"), Ricardo Decl. Ex. 6 ¶ 7.)  This 1984 release does not affect this Court's opinion, as nothing of relevance occurred between the 1984 and 1986 Releases.

Texaco released all remaining rights under the Lease on July 20, 1987 (the "1987 Release"). (Ricardo Decl. Ex. 10.) The 1987 Release was publicly recorded on November 12, 1987. (*Id.*)

### B.     Bankruptcy Proceedings

Before the 1987 Release was executed or recorded, Texaco filed a Chapter 11 petition with the Bankruptcy Court on April 12, 1987 (the "Petition Date"). (Stipulation, Definitions ¶ 1.) As of the Petition Date, "the only portion of the property subject to the 1946 Lease that was not the subject of a partial release" was the 30-acre portion surrounding Well 14 on Section 26. (Stipulation ¶ 11.) Oil production on Section 27 had ceased on November 3, 1986. (*Id.* ¶ 9.) The cause of Texaco's bankruptcy filing was a large jury verdict against Texaco and in favor of Pennzoil in an unrelated case. (*See* Hr'g Tr. 35:21–36:6, Jan. 28, 2010, Doc. 3866.)

On January 26, 1988, the Bankruptcy Court set a bar date of March 15, 1988 (the "Bar Date").[4] (Bar Date Notice ¶ 2.)[5] Any claim not filed by the Bar Date, with a few exceptions, was "forever barred and the debtors and their estates [were] forever discharged from any and all indebtedness or liability to the holder of the claim." (*Id.*)[6] One exception, relevant to Kling's position in this case, was for "any holder of an administrative expense under section 503(b) of the Bankruptcy Code entitled to priority under section 507(a)(1) of the Bankruptcy Code."

---

[4]     Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure states, "The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed."

[5]     "Bar Date Notice" refers to Notice of Bar Date for the Filing of Proofs of Claims. (Ricardo Decl. Ex. 11.)

[6]     Rule 3003(c)(2) states,

> Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

(*Id.* ¶ 3.)[7,8]  That same month, Texaco mailed notice of the Bar Date to creditors and potential creditors (Affidavit of Service by Mail of Notice of Bar Date for the Filing of Proofs of Claim, Ricardo Decl. Ex. 12), including to the address that it had on file for Kling, (Stipulation ¶ 36). Kling did not submit a proof of claim. (*Id.* ¶ 39.)

Texaco then submitted the Reorganization Plan,[9] which the Bankruptcy Court confirmed on March 23, 1988 (the "Confirmation Date"). (Confirmation Order.)[10] All debts and claims that arose before the Confirmation Date were discharged, (*id.* ¶ 22),[11] and creditors were precluded from asserting any such claim, (Reorganization Plan art. VII I at A-15).  Administrative claims were to be paid in full.  (*Id.* art. III A(1) at A-11.)  All executory contracts and unexpired leases were assumed unless objected to, per section 365 of the Bankruptcy Code.[12] (*Id.* art. VI at A-13; *see also* Confirmation Order ¶ 28.)

---

[7] "After notice and a hearing, there shall be allowed administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate including wages, salaries, and commissions for services rendered after the commencement of the case . . . ."  11 U.S.C. § 503(b)(1)(A)(i).

[8] "The following expenses and claims have priority in the following order: . . . Second, administrative expenses allowed under section 503(b) . . . ."  11 U.S.C. § 507(a)(2).

[9] "Reorganization Plan" refers to the Second Amended Joint Plan of Reorganization Proposed by Texaco Inc., Texaco Capital Inc., Texaco Capital N.V. and Pennzoil Company.  (Ricardo Decl. Ex. 1.)

[10] "Confirmation Order" refers to the Order (i) Confirming Second Amended Joint Plan of Reorganization and (ii) Authorizing Texaco Inc. To Incur Secured Indebtedness for Purpose of Consummating Plan.  (Ricardo Decl. Ex. 13.)

[11] There is a yet unresolved issue as to whether the Confirmation Date or Petition Date is the date of discharge. *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125, 128 n.1 (2d Cir. 2000).  This Court need not resolve this question because, as discussed below, Kling's claims arose prior to both dates.

[12] "The trustee shall timely perform all the obligations of the debtor . . . , arising from and after the order for relief under any expired lease of nonresidential real property, until such lease is assumed or rejected . . . ."  11 U.S.C. § 365(d)(3).

### C. The Louisiana Action and the Bankruptcy Court Decision

Almost twenty years later, on September 25, 2007, Kling filed an action against Texaco in Louisiana state court (the "Louisiana Action"). (Petition for Damages, Ricardo Decl. Ex. 14.) Kling sought damages for contamination of Section 27 allegedly resulting from Texaco's "oil and gas exploration and production activities." (*Id.* ¶ 3.) According to Kling, it did not intend to pursue any claims that were discharged in bankruptcy. (*Id.* ¶ 29.)

But Texaco claimed, and still does in this Court, that all alleged contamination in Section 27 occurred prior to the Petition Date, and thus any claim to compensation for such injury was discharged in bankruptcy. (Texaco Br. 11–12.)[13] As a result, Texaco filed its Motion to Reopen[14] in the Bankruptcy Court seeking an order requiring Kling to dismiss the Louisiana Action. After multiple rounds of briefing, the Bankruptcy Court issued an oral ruling on May 28, 2010 (the "Bench Ruling"). (Order Ex. A.) The Bankruptcy Court sided with Texaco, finding that Kling asserted pre-petition claims, since discharged by the Confirmation Order. (Bench Ruling 26:17–21.) The Bankruptcy Court also denied Kling's request to file a late proof of claim, finding that Kling did not establish that its failure to file a proof of claim prior to the Bar Date was due to "excusable neglect." (Bench Ruling 27:3–8, 31:11–16.) Following the Bench Ruling, the Bankruptcy Court issued the Order granting Texaco's Motion to Reopen and forever enjoining Kling from re-asserting any claims from the Louisiana Action.

---

[13]   "Texaco Br." refers to the Answering Brief of Texaco Inc. (Doc. 14.)

[14]   "Motion to Reopen" refers to the Motion of Texaco Inc. for Order (i) Reopening Texaco's Chapter 11 Case, (ii) Enforcing Confirmation Order Dated March 23, 1988, (iii) Finding Respondents in Civil Contempt of 11 U.S.C. § 524(a)(2) and Confirmation Order, and (iv) Directing Respondents to Dismiss Their Discharged Claims Against Texaco Inc. in the Louisiana Actions. (Doc. 3837.)

**II.      Discussion**

      **A.      Standard of Review**

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees . . ., [and,] with leave of the court, from interlocutory orders and decrees of bankruptcy judges . . . ." A district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*. *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009).

      **B.      Kling's Claims**

On this appeal, Kling argues that both contract and tort claims for restoration of Section 27 arose as a result of the 1987 Release, after the Petition Date, (Kling Br. 4–5), and thus, under various provisions of the Lease, the Bankruptcy Code, and Louisiana law, the Confirmation Order did not discharge Texaco's restoration obligation. (Kling Br. 13–19.) I disagree, addressing each of Kling's arguments in turn.

          **1.      Federal Bankruptcy Claims**

Federal bankruptcy law determines when Kling's state-law contract or tort claims arose. *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 581 (S.D.N.Y. 2001) ("[I]t is well-settled that the Bankruptcy Code governs *when* a claim arises.") (emphasis in original); *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prods. Corp.)*, 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998) ("While the existence of a claim is governed by non-bankruptcy law, the determination of when a claim arises is governed by the Code."), *aff'd*, 209 F.3d 125 (2d Cir.

2000); *see also In re R.H. Macy & Co.*, 283 B.R. 140, 145 (S.D.N.Y. 2002) ("The determination of when a claim arises is determined by the Bankruptcy Code.") (citing *LTV Steel Co. v. Shalala (In re Chateauguay Corp.)*, 53 F.3d 478, 496 (2d Cir. 1995)).[15]  The Bankruptcy Code defines a "claim" as including a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  The Second Circuit, looking to Supreme Court precedent and legislative history, has held that "the term 'claim' is sufficiently broad to encompass any possible right to payment."  *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir. 1997).  The Bankruptcy Code's definition "'contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'"  *United States v. LTV Corp. (In re Chateauguay Corp.)*, 944 F.2d 997, 1003 (2d Cir. 1991) (quoting H.R. Rep. No. 95-595, at 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266).

### 2. Kling's Contract Claim

A valid pre-petition claim requires that 1) "the claimant . . . possess a right to payment" and 2) "that right . . . arise[] prior to the filing of the bankruptcy petition."  *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods.)*, 209 F.3d 125, 128 (2d Cir. 2000).  This Court finds that whatever right to payment Kling had under the Lease arose prior to the Petition Date and was thus discharged by the Confirmation Order.

---

[15] Kling cites *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007), for the proposition that "federal bankruptcy law must be determined in accordance with state law as of the date of the bankruptcy petition."  (Kling Br. 4 (citing *Travelers*, 549 U.S. at 451 ("[W]hen the Bankruptcy Code uses the word 'claim' . . . it is usually referring to a right to payment recognized under state law.").)  This Court does not read *Travelers* to say that state law determines *when* a federal bankruptcy claim arises.  Indeed, the sentence before the one cited by Kling states only that "state law governs the *substance* of claims."  *Travelers*, 549 U.S. at 450.

Contingent claims, mentioned but undefined in the Bankruptcy Code, are "'obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009) (quoting *In re Manville*, 209 F.3d at 128–29); *In re Chateguay Corp.*, 944 F.2d at 1004 (same). Accordingly, a claim is "deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation— a right to payment—under the relevant non-bankruptcy law." *Ogle*, 586 F.3d at 146 (internal quotation marks omitted). Contract claims arise upon execution of an agreement. *See id.* at 146–47 (extending this principle from indemnification agreements to "post-petition costs arising out of pre-petition contracts more generally"); *In re Manville*, 209 F.3d at 129 ("We also agree with the bankruptcy and district courts that [appellant's] claims arose pre-petition. Here, the relationship between the parties was created upon the signing of the indemnity agreements . . . ."). The fact that environmental liability, the contingency here, "materialize[s] post-petition does not transmogrify the claim into a post-petition claim, but merely means that the contingent claim moved closer to becoming liquidated upon the happening of the contingency." *Id.*; *see also Pearl-Phil GMT*, 266 B.R. at 581 ("[U]nder the Code, a right to payment need not be currently enforceable in order to constitute a claim.").

Here, Kling's restoration claim for Section 27 arose prior to the Petition Date. Kling and Texaco executed the Lease prior to the Petition Date. Paragraph 10 of the Lease specifically obligated Texaco, "without undue delay," to pay for any and all damage that its oil operation caused to Kling's land. (Lease ¶ 10.) Any such damage and restoration payment was thus within the actual contemplation of the parties when they signed the Lease. Indeed, the alleged

damage to Section 27 occurred before the bankruptcy filing, as production had stopped in 1986 and the filing was in 1987.  As a result, Kling's right to a restoration payment was a pre-petition claim contingent upon Texaco contaminating the land, which itself occurred pre-petition.[16]

Kling presents several arguments that its restoration claim arose after the Petition Date, none of which persuade me.  First, Kling argues that Texaco's production on Section 26 after the Petition Date, (Stipulation ¶ 12), maintained the Lease in full effect.  (Kling Br. 21–22.)  For support, Kling cites paragraphs 2 and 8 of the Lease:

- "[T]his lease shall remain in force for a term of five years from this date . . . and as long thereafter as either oil or gas is produced from said land hereunder." (Kling Br. 21 (omission in original and emphasis omitted) (quoting Lease ¶ 2).)

- "[Drilling or] production on any portion of the leased premises shall (so far as concerns the continuance of this lease) inure to the benefit of the owners of the lease upon all portions of the leased premises." (*Id.* at 22 (quoting Lease ¶ 8).)

Kling also cites Article 114 of the Louisiana Mineral Code, (*Id.* at 21), which provides, "operations on the land burdened by the lease . . . sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened." La. Rev. Stat. Ann. § 31:114.

Kling's argument overlooks two points.  First, as discussed above, the Bankruptcy Code, not Louisiana law, controls when a bankruptcy claim arises.  Second, the Lease specifically permitted Texaco to release "all or any portion or portions of the leased premises as to all or any specified mineral or minerals, and thereupon . . . be relieved of all obligations as to the acreage

---

[16] The only producing well under the Lease as of the Petition Date was Well 14, located on Section 26. (Stipulation ¶ 12.)  Thus, Kling had a fully matured pre-petition claim for contamination damages on Section 27.  Kling does not dispute that the contamination on Section 27 occurred before the Petition Date.  (Kling Br. 16.)

surrendered." (Lease ¶ 8.) In the 1986 Partial Release, Texaco released all mineral rights in, and thus had no further obligation regarding, Section 27; it was no longer part of the "leased premises." Drilling and production on Section 26 past the Petition Date did not continue the Lease as to Section 27.

Second, Kling argues that the 1984 and 1986 Releases were null and void because the reservations of surface rights in these releases go beyond the plain terms of paragraph 8 of the Lease. (Kling Br. 24–26.) Specifically, Kling argues that paragraph 8 authorizes relief of all obligations "'as to the acreage surrendered'" only when the acreage surrendered is released "'in its entirety.'" (*Id.* at 25 (quoting Lease ¶ 8.) But I do not read the Lease this way. Paragraph 8 is clear that Texaco could release its rights as to all or some minerals, and if it released its rights as to all (as it did here in the 1984 and 1986 Partial Releases), it was "relieved of all obligations as to the acreage surrendered." The cleanup obligation of paragraph 10 of the Lease thus arose, at the latest, upon the release of all mineral rights.[17] That Texaco reserved surface rights to Section 27, and Kling agreed to or at least acquiesced in this reservation, does not make the release of all mineral rights any less valid under paragraph 8. Kling cites no authority for the opposite proposition. In any event, if Kling thought that Texaco, upon release of Section 27, had breached its obligation to pay for contamination damages, it could have said so at the time, which was pre-petition. The last sentence of paragraph 8, on which Kling relies, relates to rentals and does not affect Texaco's contamination obligation or void the Partial Releases.

---

[17] Neither Kling nor Texaco assert that a full release would have voided any pre-existing cleanup obligation. Indeed, it is unreasonable, and contrary to the purpose of paragraph 10 of the Lease, to conclude that the parties would have agreed to allow Texaco simply to release contaminated land without abiding by its commitment to make good on the damage promptly. *See Corbello v. Iowa Prod.*, 850 So.2d 686, 693 (La. 2003) ("Since a contract establishes the law between the parties, the purpose of contract interpretation is to determine the common intent of the parties. The meaning and intent of the parties to a written instrument should be determined within the four corners of the document and its terms should not be explained or contradicted by extrinsic evidence.") (citations omitted). That obligation survived the Partial Releases but arose before Petition Date.

Third, Kling argues that Article 2683 of the Louisiana Civil Code imposed a separate obligation on Texaco to restore Section 27 at the termination of the 1946 Lease, which occurred upon execution of the 1987 Release, after the Petition Date. (Kling Br. 26–29.) In support of this argument, Kling cites a Louisiana Supreme Court decision, *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234 (La. 2010). Again Kling's argument here fails for three reasons. First, it is based in state law, not the Bankruptcy Code, and in any event the parties here chose to accelerate that state-law obligation by contract through the requirement that Texaco make good on any damage it caused promptly upon causing it. Second, as discussed above, Texaco's 1986 Partial Release prevented any new restoration claims from accruing as to Section 27. Third, *Marin* dictates that any claim Kling had obligating Texaco to pay to clean up its contamination of Section 27 arose before the Petition Date. Article 2683(3) binds a lessee to "return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear or as otherwise provided hereafter." La. Civ. Code Ann. art. 2683(3). Under the Bankruptcy Code, this is merely a contingent claim that arose at the signing of the Lease. For the reasons above, any right to payment under this provision of the Louisiana Civil Code arose before the Petition Date as a matter of federal law.

Further, *Marin* held that a lessee still has a pre-termination claim for damages arising from contamination under other sections of the Louisiana Civil Code[18]:

> While La. C.C. art. 2683 contains obligations that only arise at the end of the lease, i.e., "to return the thing at the end of the lease in a condition . . . ," there is absolutely no language to suggest that the other obligations imposed by these codal provisions are not operational until termination of the lease. These provisions continue throughout the term of the lease and a lessor need not wait until the end of the lease to sue a lessee for damage to his property.

---

[18] Among others, the *Marin* court cited the following provision: "The lessee is liable for damage to the thing caused by his fault . . . ." *Marin*, 48 So. 3d at 256 (citing La. Civ. Code Ann. art. 2687).

*Marin*, 48 So. 3d at 256.  Thus, even if *Marin*, a Louisiana case, controlled when Kling's federal bankruptcy claim arose under the Louisiana Civil Code, Kling would still have a pre-petition claim.

Next, Kling argues that its restoration claims are administrative expenses, and thus not discharged by the Confirmation Order.  (Kling Br. 29–37.)  The Bar Date Notice did not bar administrative expenses, and the holder of administrative claims is entitled to "full satisfaction."  (Confirmation Plan art. III-A at A-11.)  The Bankruptcy Code defines "administrative expenses" as "the actual, necessary costs and expenses of preserving the estate," including "wages, salaries, and commissions for services rendered after commencement of the case."  11 U.S.C. § 503(b)(1).  Provisions allowing administrative claims "must be tightly construed," *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 669 (2006), because administrative expenses have priority under Section 507(a)(1), and thus each creditor holding an unsecured claim pays a part of the administrative claim, *see Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007).  An expense is administrative (1) "only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession" and (2) "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession." *Id.* (internal quotation marks omitted).

As discussed earlier, Kling's contingent right to payment for contamination of Section 27 arose out of the execution of the Lease, which specifically provided that Texaco reimburse Kling for any and all damages to the land without undue delay.  Because this execution (as well as Texaco's obligation to clean up) occurred prior to the Petition Date, Kling's claim cannot qualify for administrative priority.  *See Brook v. Jalbert (In re Servisense.com, Inc.)*, 382 F.3d 68, 72 (1st Cir. 2004) ("For a claim to be entitled to administrative priority in bankruptcy, it must arise

after the bankruptcy petition has been filed."); *In re Baths Int'l, Inc.*, 31 B.R. 143, 145 (S.D.N.Y. 1983) (administrative priority denied; "When [the closing date of a contract] falls before the filing of a Chapter 11 petition, the performance is rendered to a pre-petition company, not the debtor.") (internal quotation marks omitted). Further, even if the obligation to pay arose post-petition, there was no consideration for it supplied to or benefitting Texaco after its bankruptcy filing, so the second requirement for an administrative expense is also not met.

### 3. Kling's Tort Claim

Kling also argues that its restoration claim arose under a tort theory when Texaco finally released Section 27 without reservation in 1987. (Kling Br. 37–47.) Specifically, Kling asserts that Article 2315 of the Louisiana Civil Code creates an independent tort claim rather than one based on a breach of contract. (*See* Kling Br. 39–41.) Additionally, Kling cites *Reading Co. v. Brown*, 391 U.S. 471 (1968), (Kling Br. 37–38), which held that a post-petition tort of the debtor constituted an "actual and necessary cost[]" of administration of the estate. *Reading*, 391 U.S. at 485.

Kling's arguments are unavailing. Article 2315 provides, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code. Ann. art. 2315(A). But, as discussed above, the Bankruptcy Code controls when a state-law claim arises. The tortious act, the contamination of Section 27, occurred prior to the Petition Date. Thus, the Confirmation Order discharged any tort-based claim. *See Palley v. Refco Inc. (In re Refco Inc.)*, 331 F. App'x 12, 13 (2d Cir. 2009) (affirming a denial of administrative priority because "[a]lthough post-petition tort claims are given administrative priority, [plaintiff]

has not shown that the debtor committed tortious acts after the bankruptcy filing") (citing *Reading*, 391 U.S. at 485).[19]

### 4.     Texaco's Restoration Obligation Under 365(d)(3)

Kling also argues that the 1946 Lease was an "unexpired lease of nonresidential property" under Section 365(d)(3) of the Bankruptcy Code, and thus Texaco's restoration obligation was an administrative expense. (Kling Br. 42–47.) Section 365(d)(3) states, "The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3). Kling's argument raises two issues: 1) whether a Louisiana mineral lease, and the Lease here specifically, can be an "unexpired non-residential lease" under Section 365(d)(3) and, 2) if so, whether this section applies to Texaco's cleanup "obligation" under the Lease.

As to the first issue, the parties present dueling case law. Kling cites *Texaco Inc. v. La. Land & Exploration Co. (La. Land)*, 136 B.R. 658 (M.D. La. 1992), for the proposition that Louisiana mineral leases are "'executory contracts' or 'unexpired leases'" subject to assumption under the Bankruptcy Code." (Kling Br. 44.) Texaco cites *In re Ham Consulting Co./William Langnion/JV*, 143 B.R. 71 (Bankr. W.D. La. 1992), for the proposition that these leases "are not

---

[19]     This Court need not reach the question of whether a separate claim stemming from any tortious act actually exists or if Kling is simply repackaging its contract claim as a tort claim. However, the following passage from *Bunge Corp. v. GATX Corp.*, quoted in Kling's brief, suggests that this distinction is irrelevant when there is a pre-petition contract, as there is here: "[W]hen a party has been damaged by the conduct of another *arising out of a contractual relationship*, the former may have two remedies, a suit in contract or an action in tort . . . ." 557 So. 2d 1376, 1385 (La. 1993) (emphasis added) (internal quotation marks omitted). Thus, under *Bunge*, a right to payment pursued in a Louisiana tort claim for damage could still be a contract claim for the purposes of federal bankruptcy law. This Court also need not reach the question of whether *Reading* is limited to involuntary creditors with no pre-petition contractual relationship with the debtor, although that strikes the Court as a reasonable reading. (*See generally* Kling Br. 41; Texaco Br. 40.)

'unexpired leases of non-residential property.'" (Texaco Br. 43.)  This Court finds *In re Ham* more persuasive.

The relationship between a mineral lessor and lessee in Louisiana is not what is contemplated by Section 365.  Section 365(d)(3) was enacted to allow a commercial landlord to enforce ongoing duties of a tenant who went bankrupt, such as payment of rent and common area charges.  *Adelphia Bus. Solutions, Inc. v. Abnos*, 482 F.3d 602, 608 n.3 (2d Cir. 2007) (citing 130 Cong. Rec. S8891 (1984) (statement of Sen. Hatch), *reprinted in* 1984 U.S.C.C.A.N. 590, 598–99).  And in Louisiana, commercial lessors and lessees both have affirmative obligations, La. Civ. Code. Ann. §§ 2682–2713, while a mineral lessor has none other than warranty of title and non-interference, La. Rev. Stat. Ann. § 31:119, and "virtually all performance is by the lessee." *In re Ham*, 143 B.R. at 74 (internal quotation marks omitted) (referring to the right to "explore for and produce minerals" under La. Rev. Stat. Ann. § 31:114).  Here, I find nothing in the Lease that indicates that Kling and Texaco had anything other than a standard mineral lessor-lessee relationship.  For instance, Texaco did not owe Kling periodic rent payments, only royalties on any oil and gas mined from the land, (*see* Lease ¶ 3), which ended for Section 27 pre-petition. Thus, the Lease, like Louisiana mineral leases in general, is not an "unexpired non-residential lease" under Section 365(d)(3).[20]

Further, even if a Louisiana mineral lease can be considered an "unexpired, non-residential lease," only those obligations that arise post-petition and pre-rejection are entitled to

---

[20]     *La. Land* does not contradict this holding.  In that case, the court declined to decide whether a Louisiana mineral lease is an "unexpired lease" under Section 365.  *La. Land*, 136 B.R. at 666–67 ("Thus, the holding of [a Fifth Circuit case deciding the issue for a Texas mineral lease] does not prevent classification of the Louisiana mineral lease as an 'unexpired lease,' although it is not authority to the contrary either.  This court need not resolve that issue because an unexpired lease is only one type of executory contract.")  Instead, the court held that the lease at issue was an "'executory contract' within the meaning of 365(a)."  *Id.* at 668.  Whether a mineral lease is an executory contract is not relevant to Section 365(d)(3), as this subsection does not address executory contracts.  *Cf.* 11 U.S.C. 365(a) ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.").

administrative priority under Section 365(a)(3).  *See In re BH S & B Holdings LLC*, 426 B.R. 478, 483 (Bankr. S.D.N.Y 2010) ("[B]etween the filing of a bankruptcy petition and a debtor-in-possession's decision whether to assume or reject an unexpired lease, section 365(d)(3) requires a debtor-in-possession to timely perform all the obligations of the debtor . . . .  Expenses arising out of this performance are entitled to automatic administrative expense status."); *In re Nat'l Refractories & Minerals Corp.*, 297 B.R. 614, 617 (Bankr. N.D. Cal 2003) ("[I]f the trustee or debtor-in-possession fails to timely perform any lease obligations that accrue during the post-petition, pre-rejection period, the lessor is entitled to an administrative claim for damages regardless of whether the use of the leased property during this period benefitted the estate.") (citing *Towers v. Chickering & Gregory (In re Pac.-Atl. Trading Co.)*, 27 F.3d 401, 403–05 (9th Cir. 1994)).[21]  Here, as discussed above, Texaco's cleanup obligation arose pre-petition, and with the 1986 Partial Release at the latest.  Section 365(d)(3) does not afford administrative priority to damages arising from Texaco's allegedly unfulfilled cleanup obligation, and any claim to such damages was discharged in bankruptcy.

C.     **Late Proof of Claims**

Given that Kling's restoration claim is pre-petition, I now review whether the Bankruptcy Court erred in refusing to allow it to file a late proof of claim.  (*See* Kling Br. 47–48.)

---

[21]     Post-termination or post-rejection cleanup expenses result in a breach of contract, and thus are pre-petition claims.  *See* 11 U.S.C. 365(g)(1) ("[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—if such contract or lease has not been assumed under this section or under a plan confirmed under [chapter 11], immediately before the date of the filing of the petition"); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 60 (Bankr. S.D.N.Y. 2004) ("[S]ections 365(g) and 502(g) provide, unambiguously, that rejection claims are pre-petition claims."); *id.* at 58 ("Landlord's cleanup costs after rejection . . . do not warrant administrative expense treatment under section 365(d)(3).").

### 1.  Standard of Review

This Court reviews such denials for abuse of discretion.  *Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 124 (2d Cir. 2005).  Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure allows Kling to file its late claim if it can meet its burden of proving that its failure to file on time resulted from "excusable neglect." *See id.* at 121 ("The burden of proving excusable neglect lies with the late-claimant.") (internal quotation marks omitted).  The determination of whether excusable neglect exists "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission," including these four factors:  "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993).  But "'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect.'" *In re Enron*, 419 F.3d at 126 (citing *Pioneer*, 507 U.S. at 392).  The Second Circuit focuses on the reason for delay and whether it was within the reasonable control of the movant; the other three factors are more relevant in close cases.  *See id.* at 122–23.

### 2.  The Bankruptcy Court's Decision

The Bankruptcy Court found no basis for permitting Kling to file a late proof of claim. (Bench Ruling 29.)  Kling argued below that it was confused by the fact that the Confirmation Plan paid creditors, including unsecured creditors, in full, and also that it thought it had an administrative claim.  (*Id.*)  It also argued that it was confused by previous bankruptcy filings of Texaco.  (*Id.*; *see also Texaco Inc. v. Bd. of Comm'rs for the LaFourche Basin Levee Dist. (LaFourche)*, 254 B.R. 536, 549–51 (Bankr. S.D.N.Y. (2000) (describing various filings

regarding assumption of leases as "a paradigm of ambiguity," "incorrect," and "at best, highly misleading").) But the Bankruptcy Court below found it clear, reviewing those prior filings and the subsequent Restoration Plan and Bar Date Notice, that Kling would have had to file a timely proof of claim. (Bench Ruling 29–30.)[22]

Moreover, the Bankruptcy Court found that Kling's long history of seeking to enforce pre-petition claims for damages to the property caused by Texaco supported the conclusion that Kling would have been aware that they had an unsecured pre-petition claim. (*See id.* at 30; Ricardo Decl. Exs. 18 (1981 scientific test report finding hazardous soil contamination), 19 (1981 communication from Kling's attorney seeking information from Texaco regarding land covered under Lease).) Kling claims that Texaco performed "superficial" cleanup operations, such as pit closures, on Section 27 before and after the Petition Date, seeking to "bury the contamination left from its operations." (Kling Br. 18.) Kling also argues that Texaco assured Kling that it would "restore the property to its pre-lease condition," and that Kling "reasonably and justifiably relied on these representations." (*Id.* at 18–19.) But this Court does not find clear error in the Bankruptcy Court's conclusion. Kling should have protected itself, despite Texaco's assurances, by filing a claim.

Looking to other excusable neglect factors, the Bankruptcy Court found that this was not a close case. (Bench Ruling 30–31.) Indeed, it has been over twenty years since the Bar and Confirmation Dates. And prejudice would likely result for Chevron, which purchased Texaco in reasonable reliance upon the Bar Date and discharge, and Chevron shareholders, who would ultimately have to pay any judgment resulting from Kling's late filing. (*Id.* at 31.)

---

[22] Indeed, given that Texaco fully released all remaining rights in the Lease in 1987, Kling could not reasonably have thought that it would be treated like those mineral lessors whose leases were still active in 1988 when the Bar Date Notice was sent.

This Court, on review of the record, finds that the Bankruptcy court did not commit clear error in making any findings of fact, nor did it abuse its discretion in denying Kling's request to file a late proof of claim.

## III.   Conclusion

For the foregoing reasons, the judgment of the United States Bankruptcy Court, dated August 3, 2010, is hereby AFFIRMED. The Clerk of the Court is respectfully directed to docket this decision in, and terminate, the pending appeal, (Case No. 10-CV-8151).

**SO ORDERED.**

Dated: September 28, 2011
       White Plains, New York

*Cathy Seibel*
_____
CATHY SEIBEL, U.S.D.J.